<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
                                        :
WILLIAM ROBERT PILKEY,                  :
                                        :      Civil Action
                Plaintiff,              :      05-5314 (JBS)
                                        :
        v.                              :      **O P I N I O N**
                                        :
LAPPIN, H. et al.,                      :
                                        :
                Defendants.             :
_____:

**APPEARANCES:**

        WILLIAM ROBERT PILKEY, <u>pro</u> <u>se</u>
        #06633-081
        Federal Prison Camp
        1900 Simler Avenue
        Big Springs, Texas 79720

<u>**SIMANDLE, District Judge**</u>:

        Plaintiff William Robert Pilkey (hereinafter "Plaintiff")
currently confined at the Federal Prison Camp, Big Springs,
Texas, seeks to bring this action <u>in forma pauperis</u> without
prepayment of fees pursuant to 28 U.S.C. § 1915.  This Court, by
Order entered on January 13, 2006, dismissed this case because
Plaintiff had not supported his in forma pauperis application
with institutional account statements within the time required by
an earlier Order of December 6, 2005.  Subsequently, Plaintiff
moved for reconsideration, submitting the required documentation,
which this Court now considers.  Plaintiff eventually submitted

his (1) affidavit of indigence and institutional account statement pursuant to 28 U.S.C. § 1915(a) (1998); (2) his complaint (hereinafter "Complaint"); (3) a memorandum of law (hereinafter "Memorandum"); and (4) various attachments and exhibits.[1]  Based on his affidavit of indigence and the absence of three qualifying dismissals within 28 U.S.C. § 1915(g), as of the date of this Opinion and accompanying Order, the Court will grant Plaintiff's application to proceed in forma pauperis pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.  Plaintiff named various prison officials at the F.C.I. Fort Dix and at the F.C.I. Cumberland as defendants in this action.[2]  After thoroughly examining

---

[1] Plaintiff's instant Complaint was received by this Court November 9, 2005. Also, on the very same day, this Court received three other complaints from Plaintiff.  See Pilkey v. Lappin, 05-5417, Pilkey v. Lappin, 05-5418, and Pilkey v. Lappin, 05-5419.  Another complaint by Plaintiff was received by the Court on October 24, 2005.  See Pilkey v. Monmouth County Correctional Institution, 05-5073.

[2] With respect to the F.C.I. Cumberland, Plaintiff names the following parties as defendants: "Warden"; "Medical Administrator"; "Assistant Medical Director"; "All Physician's Assistants and Doctors that Gave Medical Treatment to Plaintiff." See Compl. at 1.  Plaintiff (1) left the F.C.I. Cumberland in March of 2003, see id. at 22, but (2) submitted his Complaint to this Court on November 9, 2005, that is, almost two and a half years later.

Civil rights claims, such as that presented here, are best characterized as personal injury actions and are governed by the applicable state's statute of limitations for personal injury actions.  See Wilson v. Garcia, 471 U.S. 261, 280 (1985).  Accordingly, New Jersey's two-year limitations period on personal injury actions, N.J. Stat. Ann. § 2A:14-2, governs Plaintiff's claims.  See Montgomery v. DeSimone, 159 F.3d 120, 126 & n.4 (3d

Plaintiff's submission, this Court dismisses Plaintiff's Complaint with prejudice for failure to state a claim upon which relief may be granted.

## BACKGROUND

Plaintiff's Complaint, a twenty-nine page diary, which does not constitute a short and plain statement as required by Rule 8(a) of the Federal Rules of Civil Procedure, is as detailed as it is rambling and confusing; it lists Plaintiff's physical sensations and thoughts, poses rhetorical questions and replicates dialogues between the Plaintiff and various employees at Fort Dix. Day-by-day (and, on occasion, hour-by-hour), the Complaint traces various ailments either suffered or believed to be suffered by Plaintiff and, as a whole, appears to allege that the treatment the Plaintiff received--or was not provided with--

---

Cir. 1998); Cito v. Bridgewater Township Police Dept., 892 F.2d 23, 25 (3d Cir. 1989). Under N.J. Stat. Ann. § 2A:14-2, an action for an injury to the person caused by a wrongful act, neglect, or default must be commenced within two years of accrual of the cause of action. See Cito, 892 F.2d at 25; accord Brown v. Foley, 810 F.2d 55, 56 (3d Cir. 1987). Unless their full application would defeat the goals of the federal statute at issue, courts should not unravel states' interrelated limitations provisions regarding tolling, revival, and questions of application. See Wilson v. Garcia, 471 U.S. at 269. Since Plaintiff's instant Complaint was submitted to this Court almost six months after the applicable period of limitations expired, Plaintiff's claims against the staff of F.C.I. Cumberland are time barred, and Plaintiff's claims against the F.C.I. Cumberland are not considered by this Court.

in connection with these ailments violated Plaintiff's Eighth Amendment rights.  See generally, Compl.[3]

## STANDARD OF REVIEW

In 1996, Congress enacted the Prison Litigation Reform Act ("PLRA"), Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996).  Congress's purpose in enacting the PLRA was "primarily to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Tort Claims Act . . . many of which are routinely dismissed as legally frivolous."  Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996).  A crucial part of the congressional plan for curtailing meritless prisoner suits is the requirement, embodied in 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), that a court must dismiss, at the earliest practicable time, any prisoner actions that are frivolous or malicious, fail to state a claim, or seek monetary relief from immune defendants.  However, in determining the sufficiency of a complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  See

_____

[3] While Plaintiff subdivided his submission into various chapters and designated them as "Memorandum," "Exhibits," etc., the entire submission is consecutively paginated and, thus, cited to in this opinion as Complaint in order to maintain clarity. The Complaint begins with "Medical Issues Covered in This Suit," and lists these issues as follows: (1) "Ingrown Toenail," (2) "Chest Hernia," (3) "Balanitis or Genital Herpes," (4) "Diabetic [sic.]," (5) "Balanoposthitis," (6) "Ultra Sound," and (7) "Lab Test and Blood Test."  See Compl. at 3-4.

Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969
F.2d 39, 42 (3d Cir. 1992).  The Court should "accept as true all
of the allegations in the complaint and reasonable inferences
that can be drawn therefrom, and view them in the light most
favorable to the plaintiff."  Morse v. Lower Merion School Dist.,
132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however,
lend credit to a pro se plaintiff's "bald assertions" or "legal
conclusions."  Id.  Thus, "[a] pro se complaint may be dismissed
for failure to state a claim only if it appears 'beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief.'"  Milhouse v. Carlson,
652 F.2d 371, 373 (3d Cir. 1981) (quoting Haines v. Kerner, 404
U.S. 519, 520 (1972)).

## **DISCUSSION**

**A.    Eighth Amendment Rights:  Medical Care**

Plaintiff has a protected right in being incarcerated at a
place of confinement confirming to the standards set forth by the
Eighth Amendment.  The Constitution "does not mandate
comfortable prisons," Rhodes v. Chapman, 452 U.S. 337, 349
(1981), but neither does it permit inhumane ones, and it is now
settled that ""he treatment a prisoner receives in prison and the
conditions under which he is confined are subject to scrutiny
under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25,

31 (1993).  In its prohibition of "cruel and unusual punishments, the Eighth Amendment . . . imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials . . . must take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-527 (1984), see  Helling, 509 U.S. at 31-32; Washington v. Harper, 494 U.S. 210, 225 (1990); Estelle v. Gamble, 429 U.S. 97, 103 (1976).  The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. Rhodes, 452 U.S. at 346, 347.  The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Rhodes, 452 U.S. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

Thus, to prevail on a medical care claim under the Eighth Amendment, an inmate must show that the defendants were deliberately indifferent to his serious medical needs.  See Estelle v. Gamble, 429 U.S. 97; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Persistent severe pain qualifies as a serious medical need.  A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correctional

6

Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

"Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Furthermore, deliberately delaying necessary medical diagnosis for a long period of time in order to avoid providing care constitutes deliberate indifference that is actionable. See Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993). Deliberate indifference is also evident where officials erect arbitrary and burdensome procedures that result in interminable delays and denials of medical care to suffering inmates. See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987), cert. denied 486 U.S. 1006 (1998). However, neither inconsistencies or differences in medical diagnoses, nor refusal to consider inmate's self-diagnoses, to summon the medical specialist of the inmate's choice, to perform tests or procedures that the inmate desires, to explain to the inmate the reason for medical action or inaction, or to train the inmate to perform medical procedures can amount to cruel and unusual punishment. See White v.

Napoleon, 897 F.2d 103 (3d Cir. 1990) (mere disagreements over medical judgment do not state Eighth Amendment claims).

### 1.    Plaintiff's Ingrown Toenail Claim

Plaintiff's first medical claim is related to Plaintiff's ingrown toenail.  Plaintiff developed this problem two and a half years ago, before arriving at Fort Dix.  See Compl. at 3.

The Complaint specifies: (a) ten occasions during which Plaintiff either had discussions with various members of the medical staff at Fort Dix about his ingrown toenail or had the toenail examined by various medical staffers, id. at 8-16; (b) two instances when Plaintiff "cut off [his] toenail [on his own] in the shower with a toenail clipper suppl[i]ed by [a] correctional officer," id. at 9, 11-12; (c) one instance when a physician assistant informed Plaintiff that she referred Plaintiff to a podiatrist, id. at 11; and (d) one instance when a physician's assistant cut Plaintiff's "toenail off [and] told [Plaintiff] that she would . . . do it again in [a few] months."[4] Id. at 17, 23.  The Complaint further states that "the toenail has been clipped by the prison medical staff four times." Id. at 19.  Plaintiff's Complaint concludes, with respect to the toenail issue, with two statements: (1) that "[t]he toenail now looks

_____

[4] Plaintiff's statements with respect to how often the procedure was promised to be repeated differ: while one statement alleges a promise to cut Plaintiff's toe three times a year or so, the other indicates a promise to cut his toenail four times a year or so.  See Compl. at 17, 23.

pretty good and has almost grown back, [and] there has been no infection of the toe," id. at 23, but (2) Plaintiff believes that he was deprived of medication that would cure Plaintiff for good by preventing his toenail from growing. Id. at 17, 25.

Plaintiff's Complaint, however, does not allege that Plaintiff suffered any serious injury as a result of his ingrown toenail, and Plaintiff's physical pain was limited to a single occasion when Plaintiff decided to cut the toenail on his own. See Compl. at 9-12. Moreover, nothing in Plaintiff's complaint indicates that the medical staff of Fort Dix was indifferent to Plaintiff's need for treatment; in fact, the treatment administered was so effective that Plaintiff's "toenail now looks pretty good and has almost grown back, [and] there has been no infection of the toe."[5] The sole issue advanced by Plaintiff is Plaintiff's dissatisfaction with the promptness and frequency of treatment, since it is not as speedy or as relentless as Plaintiff desires. Such allegations fail to state a claim upon which a relief may be granted. See Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990); Gatewood v. Hendrick, 368 F.2d 179 (3d Cir. 1966), cert.

_____

[5] Plaintiff's desire to obtain a magic cure that would stop his toenail from growing, see Compl. at 23, is irrelevant to the Eighth Amendment test since there are no medications preventing human nails from growing. "A doctor may recommend partial removal of a severely ingrown nail." <<www.webmd.com/content/article/8/1680545 26.htm>>.

<u>denied</u>, 386 U.S. 925 (1967) (prisoner who did not claim that he was denied any medical care but rather that he received only inadequate medical care, and gave no indication that he sustained serious physical injury as result of alleged inadequate treatment, failed to state claim for relief); <u>see</u> <u>also</u> <u>Alsina-Ortiz v. Laboy</u>, 400 F.3d 77 (1st Cir. 2005)(a doctor's failure to respond to certain request for services by the inmate, in context of the doctor's continued and regular services, did not deprive the inmate of any meaningful treatment); <u>Boardley v. First Corr. Med.</u>, 2004 U.S. Dist. LEXIS 25918 (D. Del. Dec. 21, 2004) (where prison officials failed to treat promptly and properly inmate's two ingrown toenails and complications led to surgery on his toes, the inmate's allegations did not state a claim under 42 U.S.C. § 1983 because the inmate's temporary pain and loss of mobility did not establish that the inmate suffered a serious injury and medical treatment was eventually given remedying the problem); <u>Watson v. Weldon</u>, 2000 U.S. Dist. LEXIS 11109 (D.S.C. Jan. 12, 2000) (prisoner's claim that prison doctor's slow treatment of plaintiff's toenail fungus was cruel and unusual punishment failed to state a serious medical condition sufficient to support a claim for relief).

**2.    Claims Related to Chest Hernia**[6]

Plaintiff's Complaint asserts that Plaintiff developed chest pains on June 1, 2004. See Compl. at 6. He complained about the pain, dizziness and having "trouble breathing" at 4:15 A.M., and had a medical staff member attend him at 5:25 A.M. Id. Plaintiff was given full examination and diagnosed with (a) chest congestion, and (b) excessive wax in Plaintiff's ears causing Plaintiff dizziness. Id. Plaintiff's Complaint states that Plaintiff had the next round of chest pains on September 13, 2004, and was given a blood pressure test and chewable tablets to alievate the condition that very day. Id. at 12. Plaintiff had chest pain again on September 22 and 23, 2004, and was checked by a physician's assistant on the 23, 2004, receiving a blood pressure test and medication. Id. at 13. The following round of chest pain occurred on September 30, 2004, and Plaintiff was sent to the medical unit within 20 minutes of notifying the prison officials about his pain; he received examination, including an

_____

[6] Plaintiff did not clarify what is "chest hernia," hence leaving it for this Court to detect what was the ailment Plaintiff asserted. Since it appears there is no such ailment as "chest hernia," the Court presumes that Plaintiff alleges either hiatal hernia or gastroesophageal reflux disease. See <<www.webmd.com/hw/digestive_problems/hw239946-relinfo.asp>>. (Plaintiff states that he was, at some point, told by a physician's assistant that Plaintiff had a "haynial hernia," see Compl. at 15, but there appears to be no such disease either.) Hiatal hernia is an abdominal hernia that may manifest itself by chest pains akin to heartburn. <<www.webmd.com/hw/digestive_problems/hw239949.asp>>.

E.K.G., from a physician's assistant.  Id. at 14.  The next chest
pain (which "only lasted for a few seconds") took place on
October 2, 2004, and Plaintiff discussed it with the physician's
assistant the next day, on October 3, 2004.  See id. at 16.
Plaintiff, in his attempts to self-diagnose, conducted a self-
examination by "laying down and [then] rais[ing] up [thus]
putting pressure on [his] stomach"; the examination led to
Plaintiff to detect "loose skin" and "pouches . . . running from
the middle of [his] chest down to [his] stomach."  Id. at 15.
Since, on the dates unstated in the Complaint, Plaintiff kept
notifying the medical staff of his chest pain again, (a)
Plaintiff was given medication to alleviate his chest pain, id.;
(b) Plaintiff was examined by an outside surgeon who told
Plaintiff that, if Plaintiff had a hernia, "the hernia did not
need to be operated," id. at 24; but, since Plaintiff kept
insisting on his need to be operated, (c) Plaintiff was offered
surgery upon condition that Plaintiff would execute "an inmate's
release of future liability that might arise after surgery."[7]
Id. at 20.  Plaintiff's Complaint concludes, with respect to the
chest hernia issue, with the statement that Plaintiff "do[es] not
know what is wrong [with Plaintiff, health-wise,] because the

---

[7] It appears that Plaintiff declined surgery, since the
Complaint alleges that such request for release of liability was
part of deliberate indifference of the medical staff to
Plaintiff's Eight Amendment rights.  See Compl. at 20.

medical staff has a different opinion as to what is wrong[,] and that keeps [Plaintiff] in a state of shock.  Is it serious or what?" Id. at 25.

None of these assertions state a cognizable Eighth Amendment claim.  Since the Complaint describes Plaintiff's condition in terms of occasional roaming painful sensation, or dizziness, or "a few seconds" of sharp pain, this condition does not appear to be the persistent severe pain which qualifies as a serious medical need. See, e.g., Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996); (a prison medical staff's refusal to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue . . . does not violate the Constitution"); Williams v. Williams, 2006 U.S. Dist. LEXIS 15008 (S.D. Ohio Mar. 31, 2006) (mild pains do not amount to a "severe medical need"); compare Lavender v. Lampert, 242 F. Supp. 2d 821 (D. Or. 2002) (interpreting Estelle, 429 U.S. at 104, and spelling out that only the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain qualifies as "serious medical need").

Similarly, Plaintiff's self-diagnosis, which differed from those rendered by medical professionals, or Plaintiff's self-determination that he needed a treatment other than offered to him, same as Plaintiff's emotions associated with lack of

certainty about the condition that Plaintiff has cannot qualify as a "serious medical need."  See White v. Napoleon, 897 F.2d 103 (3d Cir. 1990) (mere disagreements over medical judgment do not state Eighth Amendment claims); see also Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be held deliberately indifferent to an existing serious medical condition, not a speculative future medical injury); Jones v. Lockhart, 484 F.2d 1192 (8th Cir. 1973) (allegations of mere differences of opinion over matters of medical judgment fail to state a federal constitutional question); Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970) (a difference of opinion between physician and patient did not sustain a claim under § 1983; the conduct must be so harmful that it should be characterized as a barbarous act that shocked the conscience); Church v. Hegstrom, 416 F.2d 449 (2d Cir. 1969) (mere negligence does not suffice to support a § 1983 action); Goff v. Bechtold, 632 F. Supp. 697 (S.D. W. Va. 1986) (denial of preferred course of treatment does not infringe constitutional rights).

However, even if this Court is to conclude otherwise and hypothesize that Plaintiff's chest pains were sufficiently serious, the statements made in the Complaint indicate that Plaintiff constantly received prompt medical attention, tests assuring that Plaintiff's heart was functioning properly,

14

medications remedying Plaintiff's condition and an examinations
by an outside specialist; and Plaintiff's desire for more
agitation over his occasional chest pain is of no relevance to
the protection offered by the Eighth Amendment.  See Hasty v.
Johnson, 103 Fed. Appx. 816 (5th Cir. 2004) (prisoner failed to
state a claim for deliberate indifference to his medical needs
where he alleged that medical personnel provided him with
purportedly less efficacious drugs for gastroesophageal reflux
disease; the decisive fact was that he received "a" treatment).
The continuous treatment of Plaintiff indicates anything but
"deliberate indifference" to Plaintiff's chest pains on the part
of Fort Dix medical personnel.  See, e.g., Turley v. Smith, 2005
U.S. Dist. LEXIS 15961 (N.D. Ill. July 27, 2005) (the inmate was
not entitled to relief on his 42 U.S.C. § 1983 claim where the
inmate disagreed with the course of treatment the doctors
prescribed for his hernia).

Finally, contrary to Plaintiff's assertions, the mere fact
that the prison officials requested Plaintiff's written release
as a condition to perform the surgery which Plaintiff desired
even though the surgery was found medically unnecessary, did not
amount to "cruel and unusual punishment."  See Bruce v. Smith
Unit Med. Dep't, 2002 U.S. Dist. LEXIS 8686 (N.D. Tex. May 16,
2002) (where the inmate refused to sign a release form and told
the member of medical staff that he would "see [her] in federal

15

court," the inmate was not entitled to relief since his refusal to execute the form prevented the medical staff from administering the treatment the inmate desired). Therefore, Plaintiff's allegations with regard to this medical issue fail to state a claim upon which relief may be granted. See Estelle, 429 U.S. 97; Durmer, 991 F.2d 64; White v. Napoleon, 897 F.2d 103.

### 3. Claims Related to Diabetes

On September 25, 2004, seeing a physician's assistant passing by with a glucose machine, Plaintiff asked the assistant to give him a test and, upon showing of sugar level of 254, was suggested by the assistant that Plaintiff could be a diabetic. See Compl. at 13. The test was followed by another test, administered forty-eight hours later, showing sugar level of 209; it was followed by a repeated guess by the assistant that Plaintiff could be diabetic. Id. at 13-14. On September 30, 2004, Plaintiff was given another test and, upon showing of sugar level of 250, was given diabetes medication to be taken daily. Rendition of these daily medications, plus daily or nearly daily blood sugar tests were executed by the medical staff of the F.C.I. Fort Dix since that very day. See Compl. Nonetheless, Plaintiff's Complaint concludes, with respect to the diabetes issue, with the following statement:

> Just recently[,] September or October [of] 2004, I was told that I was a diabetic level II. I looked at my medical records up to the time I came to Fort Dix, [and] my records indicate that I had diabetes before I

16

came to Fort Dix, but I was never told [that].  I am
concerned because I was not told how to help myself
when a person has diabetes.  I do know that diabetics
loose body parts[,] and I have the bad ingrown toenail
[that] needed to be cut.  Is it possible that I could
have lost my toe?  I have had several dizzy blackout
spells the last two years . . . .  I was given [a]
blood pressure test and an E.K.G. each time and sent
back . . . .  Is it possible that my blood sugar got
too high or too low, which cause the blockout?  To this
day, [the] medical [unit] has not explained [me] what
is the problem with me.

Id. at 25-26.

     Plaintiff's desire for education with respect to how a
diabetic patient should take care of himself, same as Plaintiff's
anxiety and neuroticism, do not present a "serious medical need,"
and the constant testing and medication provided to Plaintiff by
the medical staff of Fort Dix indicate anything but "deliberate
indifference" to Plaintiff's diabetic condition, regardless of
Plaintiff's desire for more attention to his diabetes.  See
Estelle, 429 U.S. 97; Durmer, 991 F.2d 64; White v. Napoleon, 897
F.2d 103; accord McClung v. Camp County, 627 F. Supp. 528 (E.D.
Tex. 1986) (evidence that diabetic inmate was given medication 3
times per day instead of prescribed 4 daily doses was
insufficient to constitute constitutional violation in absence of
demonstrated harm); Jefferson v. Douglas, 493 F. Supp. 13 (W.D.
Okla. 1979) (inmate's difference of opinion with prison medical
staff as to proper diet he was to receive for his diabetes did
not constitute cruel and unusual punishment to sustain claim
under 42 U.S.C. § 1983); Patterson v. Lilley, 2003 U.S. Dist.

17

LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be held deliberately indifferent to an existing serious medical condition, not a speculative future medical injury); Lovell v. Brennan, 566 F. Supp. 672 (D. Me. 1983) (deprivations of health-related educational opportunities do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments).

### 4.    Claims Related to Balanoposthitis, Balanitis, and Herpes

Plaintiff believes that he had genital herpes (since an unspecified member of "medical staff had told" him so on an unspecified date), and Plaintiff complained to the health administrator on August 11, 2004, about the pain that Plaintiff associated with herpes.[8]  See Compl. at 10.  On August 13, 2004, Plaintiff was examined by a physician's assistant who (a) stated

---

[8]    Plaintiff provided this Court with no explanations as to what form of herpes Plaintiff has.  However, in view of the statements made in Plaintiff's Complaint, this Court presumes that Plaintiff asserts genital herpes.  "Genital herpes, a sexually transmitted disease . . ., is an infection caused by the herpes simplex virus (HSV).  HSV is in the same family of viruses that causes chickenpox, shingles and mononucleosis. There are two types of HSV: HSV-1, which infects 80 percent of the U.S. population, usually appears on the lips in cold sores; HSV-2 is usually found in the genital area.  However, if a person with HSV-1 oral herpes (cold sores) performs oral sex, it is possible for the partner to get HSV-2 genital herpes. And HSV-2 can infect the mouth through oral sex."  Linda Bren, Genital Herpes: A Hidden Epidemic, FDA Consumer (March 4, 2002)

that Plaintiff suffered from Balanitis[9] rather than herpes, and the only cure was circumcision, see id. at 10, (b) prescribed Plaintiff a genital cream and an antibiotic ointment to alleviate the condition, see id. at 11, and (c) recommended Plaintiff to wash Plaintiff's penis several times a day.  See id.  Plaintiff requested daily showers but was denied on the grounds that Plaintiff, a Special Housing Unit ("S.H.U.") inmate at the time, was allowed to shower only a few times a week.[10]  Although the condition of Plaintiff's penis improved after the treatment, Balanitis symptoms temporarily reappeared on August 31, 2004, after which Plaintiff was advised by the physician's assistant that Plaintiff would "have the problem off and on until [Plaintiff is] circumcised."  Id.  The physician's assistant came to check on Plaintiff's Balanitis on September 13, 2004;, and brought "another person from [the] medical [unit] to discuss

---

[9]    Plaintiff's Complaint is equally silent as to what kind of disease is Balanitis.  Moreover, to make the matters more confusing, Plaintiff uses various short-hand spellings for "Balanoposthitis," including "Balanitis."  It appears that Balanoposthitis is an inflammation of the head and the foreskin of the penis, see <<www.webmd.com/content/article/46/2953489.htm>>, while Balanitis is a related, although a less serious condition of inflammation of the head of the penis.  See id.

[10]    This Court is not entirely clear as to the connection between a daily shower and the instruction to wash Plaintiff's penis a few times a day since it appears that (a) Plaintiff was allowed to execute such numerous daily washes in the sink or by sponge-bathing, and (b) a *single daily* shower could not substitute for *numerous daily* washes recommended to Plaintiff.

19

[Plaintiff's] condition." Id. at 12. This other member of the medical staff concurred in the diagnosis and treatment recommendations, and provided Plaintiff with "two pieces of gauze [to be] put between the foreskin of [Plaintiff's] penis."

The Complaint concludes, with respect to the Balanitis issue, with the following statement:

> [Before coming to Fort Dix, Plaintiff] thought [Plaintiff] had herpes, but the medical staff at [the] F.C.I. Fort Dix is split on what [Plaintiff] ha[s], but the medical staff refuses to give [Plaintiff] the blood test or let [Plaintiff] see a urologist. [Plaintiff] need[s] some peace of mind because [Plaintiff] do[es] not know what [Plaintiff] ha[s]. . . . Plaintiff believes that [B]alanitis has affected [his] prostate glands[,] and the medical staff refuses to listen [to this belief of Plaintiff's,] and this could be a big imminent problem.

Id. at 25-26, accord id. at 14 ("[Plaintiff] told [the doctor] about how [his] medical records may be wrong, [and that Plaintiff] want[s] a blood test done to see [for himself] if [Plaintiff] ha[s] herpes. There is a different opinion between the medical staff on what [Plaintiff] ha[s].")

Neither Plaintiff's anxieties about inconsistencies of medical opinions nor Plaintiff's suspicions that he might develop a medical problem in the future constitute a cognizable Eighth Amendment claim. See Keith v. Hines, 2006 U.S. Dist. LEXIS 25991 (W.D. Okla. Mar. 13, 2006) (the inmate failed to state a § 1983 claim where the inmate alleged inadequate medical care based on the medical staff's refusal to entertain the inmate's

continued need to complain about the condition of his penis);
Watson v. Schilling, 2005 U.S. Dist. LEXIS 3526 (W.D. Va. Mar. 9,
2005) (an inmate's § 1983 complaint failed to allege any facts to
support a claimed violation of his Eighth Amendment rights
because the medical evidence established that the inmate had been
seen and treated on a monthly and daily basis for each and every
medical condition that he had alleged, including a rash on his
penis that he believed to be herpes).

The Complaint unambiguously states that Plaintiff was given
regular examinations with regard to his genital problem, offered
effective medication during the periods when the problem
manifested itself as a physical condition and was duly advised of
the corrective surgical procedure which Plaintiff declined.
These actions by the medical staff of the F.C.I. Fort Dix
indicate that the staff was not "deliberately indifferent" to
Plaintiff's medical need by refusing to entertain Plaintiff's
desires for examination by another doctor or for alternative mode
of testing.  See Alsina-Ortiz v. Laboy, 400 F.3d 77 (1st Cir.
2005)(a doctor's failure to respond to certain request for
services by the inmate, in context of the doctor's continued and
regular services, did not deprive the inmate of any meaningful
treatment); Smith v. Sator, 102 Fed. Appx. 907 (6th Cir. 2004)
(where a prisoner alleged that defendants did not provide various
specialized medical tests that the prisoner found to be necessary

21

based on his reading of medical literature, the court held that the complaint was frivolous because refusal to provide specialized tests amounted to nothing more than a difference of opinion regarding the medical diagnosis and treatment and did not rise to the level of an Eighth Amendment violation); Lopez v. Kruegar, 1990 U.S. Dist. LEXIS 6808 (E.D. Pa. June 4, 1990) (where plaintiff stated that he was receiving medication but felt that additional medical tests should be taken, his allegations were directed at the wisdom or quality of treatment and did not state a claim); Coleman v. Crisp, 444 F. Supp. 31 (W.D. Okla. 1977) (difference of opinion between plaintiff and doctors concerning availability of treatment and medication did not establish violation of constitutional right or sustain claim); Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be held deliberately indifferent to an existing serious medical condition, not a speculative future medical injury); McNeil v. Redman, 21 F. Supp. 2d 884 (C.D. Ill. 1998) (an inmate has no constitutional right to see a doctor on demand; the decision whether to summon a doctor, like the question of whether a certain diagnostic technique or form of treatment should be prescribed, "is a classic example of a matter for medical judgment") (quoting Estelle, 429 U.S. 97); Goff v. Bechtold, 632 F. Supp. 697 (S.D. W. Va. 1986) (denial of preferred course of treatment does not infringe constitutional

22

rights).  Consequently, Plaintiff's allegations with respect to his genital ailments fail to state a claim upon which relief may be granted.

### 5.  **Claims Related to Ultrasound and Blood Tests**

On September 30, 2004, during a check up conducted by a physician's assistant, Plaintiff was told that "an ultra sound test would tell . . . if [Plaintiff] ha[s] blocked arteries, but the prison will not do an ultra sound [test] without permission from the [BOP]."  Id. at 14. Plaintiff's Complaint concludes, with respect to the ultra sound issue, with the following statement: "Plaintiff *may need* an ultra sound to check his blocked arteries, but again the medical staff will not listen or even check to see *if* [Plaintiff] could have blocked arteries."[11] Id. at 26.

In addition, there appear to be three types of complaints set forth by Plaintiff with respect to blood testing:

a.   Plaintiff was demanding blood tests to determine with certainty whether Plaintiff "really had herpes" or Balanitis, see id. at 11, but the medical staff either deemed such testing unnecessary in view of their

---

[11] It is presumed that Plaintiff's interest in the ultrasound testing was based on his concern about the health of his heart.  Plaintiff acknowledges, however, that all tests of the heart showed that his "heart was strong" and "in good shape." See Compl. at 15, 16.  Again, his subjective anxiety about his health does not rise to the level of a serious medical condition.

observations or the details of ailment provided by

Plaintiff, see id. at 10, 14-15, 17, or put Plaintiff on the

list of those to be tested instead of administering the test

immediately. See id. at 12.

b.    The medical staff drew Plaintiff's blood for testing but

failed to clarify the reason why they believed the tests

were needed. See id. at 17, 26 (Plaintiff was "called back

to [the] medical [unit] . . . to give blood two times [but

he did not know for what. [The] medical [staff did] not

answer [his] questions as to why they took [his] blood").

c.    On one occasion, Plaintiff's laboratory test results were

misplaced and never made it part of Plaintiff's medical

file. See id. ("On October 18, 2004, at 10:00 A.M. [a

member of] medical [staff] showed up to draw [Plaintiff's]

blood [and told Plaintiff that the medical unit would use

the blood to] give [Plaintiff] a[n] A/C glucose test, a

herpes test and a test for Balanitis. Well, [Plaintiff]

never got the results of the tests [and, when Plaintiff

examined his medical records,] the results were missing").

        None of the above assertions amounts to a viable Eighth

Amendment claims, since each of these assertions presents either

Plaintiff's speculation about what test *could* be needs to

evaluate his present or future physical condition, or claim about

mishandling of Plaintiff's medical files or lack of reports of

test results to Plaintiff.  Since not a single one of these
assertions indicates any physical pain or injury, moreover a
"serious medical need," neither Plaintiff's fits of panic nor his
dissatisfactions with record-keeping or results-reporting
practices could qualify as "cruel and unusual punishment.  See
Ford v. Lane, 714 F. Supp. 310 (N.D. Ill. 1989) ("The question
whether an X-ray--or any additional diagnostic techniques or
forms of treatment--is indicated is a classic example of a matter
for medical judgment. A medical decision not to order an X-ray,
or like measures, does not represent cruel and unusual
punishment") (quoting Estelle, 429 U.S. at 107); Patterson, 2003
U.S. Dist. LEXIS 11097, (speculative future medical injury is not
actionable).  Plaintiff's "lack of more testing" allegations fail
to state a claim upon which relief may be granted.  See Estelle,
429 U.S. 97; Durmer, 991 F.2d 64; White v. Napoleon, 897 F.2d
103.

### 6.   Claims Related to Other Ailments

In addition to the conditions discussed above, Plaintiff
alleges that he suffers from various other ailments and
occasional troubling physical sensations.  See generally, Compl.
For instance, Plaintiff asserts that he suffers from acid reflux.
It appears that Plaintiff contacted the medical unit with respect
to this ailment on May 14, 2004. See id. at 5. However, Plaintiff
was prescribed Zantac twice a day to alleviate this condition on

25

May 17, 2004, and has been taking the medication since.  See id.
No indifference to his condition can be shown.

Furthermore, Plaintiff lists the following physical
sensations:

a.    On June 9, 2004, Plaintiff was "feeling nausea," his "head
      [was] stuffy and [his] eyes [were] not focusing good. [He
      saw] black spots," but the attending member of the medical
      staff did not find anything abnormal.  Id. at 7.

b.    "From June 12, 2004, to June 17, 2004, [Plaintiff] had
      sleepless nights."  Id.

c.    "On June 20, 2004, [Plaintiff was feeling] drowsy, [had]
      runny eyes[,] and [his] chest [was] hurting, not [with]
      shooting pains, but like something [has] stopped up and
      [resulted in a] dead center of [his] chest."  Id. at 8.

      While Plaintiff is dissatisfied with the degree of attention
that these sensations received from the medical staff of the
F.C.I. Fort Dix, none of these sensations presented a "serious
medical need" triggering the Eighth Amendment protections short
of, perhaps, Plaintiff's acid reflux which was treated swiftly
and constantly after plaintiff was so diagnosed.  Therefore,
Plaintiff's scattered allegations with respect to his asid reflux
and various physical sensations fail to state a claim upon which
relief may be granted.  See Estelle, 429 U.S. 97; Durmer, 991
F.2d 64; White v. Napoleon, 897 F.2d 103; Hasty v. Johnson, 103

26

Fed. Appx. 816 (5th Cir. 2004) (prisoner failed to state a claim for deliberate indifference to his medical needs where he alleged that medical personnel provided him with medication for his gastroesophageal reflux disease; even if the prisoner wished for more or different medications, the decisive fact was that he received "a" treatment); Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996); (untreated mild headache does not violate the Constitution); Grant v. New York City Dep't of Corrections, 1996 U.S. App. LEXIS 33502 (2d Cir. Dec. 23, 1996) (relying on Estelle, 429 U.S. 97, and citing Hathaway v. Coughlin, 99 F.3d 550 (2d Cir. 1996)); Hutchinson v. Civitella, 2003 U.S. Dist. LEXIS 15417 (S.D.N.Y. Sept. 4, 2003)(occasional chest pain, nausea, inability to keep food down, rapid weight loss, dizziness, light-headedness, unsteadiness and emotional distress cannot qualify as "a condition of urgency, one that may produce death, degeneration or extreme pain") (quoting Hathaway, 37 F.3d at 66); Gibson v. McEvers, 631 F.2d 95 (7th Cir. 1980) (a failure to treat symptoms of common cold does not violate Eighth Amendment); Universal Calvary Church v. City of New York, 2000 U.S. Dist. LEXIS 15153 (S.D.N.Y. Oct. 13, 2000) (insomnia does not qualify as a "serious injury").

**7.  General Claims Related to the Quality of Medical Treatment**

Plaintiff's Complaint concludes with the following statement:

> Plaintiff . . . ask[s] that the Court award[s to
> Plaintiff] one million two hundred thousand dollars
> [against] the staff [of] F.C.I. Cumberland . . . and
> F.C.I. Fort Dix.  . . . [Plaintiff] believe[s] the
> [BOP] should allow a complete physical and all
> necessary check ups to be performed by an outside
> medical facility to ensure that [P]laintiff's medical
> needs are met.  . . .  [Plaintiff] have pleaded with
> the medical staff to help [him, but] they basically
> give [Plaintiff] more pills to cure/relieve pain.
> [Plaintiff] ha[s] endured mental stress for 2-1/2 years
> . . . . It is obvious that it is time to sue the
> medical staff . . . for medical malpractice, because
> pleading stress and pain did not get their attention. .
> . . Plaintiff . . . asks the Court to order the [BOP]
> to do a complete medical examination of . . . Plaintiff
> from head to toe, to insure that . . . [P]laintiff's
> medical needs are given the attention he deserves.

Compl. at 24, 26-27.

This statement is made regardless of multiple thorough
examinations that Plaintiff received.  See, e.g., id. at 8, 10,
13-14 (on June 23, 2004, Plaintiff was "taken to the medical
room" where his blood pressure was checked (and showed normal),
and "[t]he nurse checked [his] feet, [his] stomach ulcer, [his]
chest congestion, [his] ingrown toenail[,] talked to [him] about
[his] headaches [and his] medical background[,] gave [him]
antibiotic ointment for the cut on [his] lip [and provided him
with] all of the medication[s]"; "[o]n August 13, 2004, a
[physician's assistant] came early and . . . talked [to
Plaintiff] about [his] medical problems. [Plaintiff] was
satisfied that she knew what she was doing . . . . [She] gave
[Plaintiff] a blood pressure test [(which showed normal) and]
checked [Plaintiff's] penis"; "[o]n September 23, 2004, when the

28

physician's assistant came to take Plaintiff's blood pressure,
and Plaintiff complained about feeling hungry, the physician
assistant provided Plaintiff with a vanilla drink"; "[o]n
September 29, 2004, a doctor and a physician's assistant visited
Plaintiff to discuss Plaintiff's chest pains, loss of strength,
Balanitis and various blood tests").

Moreover, this statement is made regardless of the long list
of medications that the medical staff of the F.C.I. Fort Dix
provided to Plaintiff.  See id. at 9 (the total list of
medications administered to Plaintiff on constant basis as of
July 10, 2004, included: Amoxicillin (500 mg.); Cephalexin (500
mg); allergy tablets for his sinuses, Bacitracin/Poly B ointment;
Rabeprazole (20 mg); Meclizine; Acataminophen (500 mg); Naproxen
Sodium (500 mg) and Ranitidine (150 mg)).

However, while Plaintiff appears to be of opinion that he
was sentenced to imprisonment so the BOP would keep performing
full medical examinations of Plaintiff "from head to toe" and to
have a doctor at Plaintiff's disposal around the clock in order
to detect every current and future Plaintiff's medical need and
provide Plaintiff with every treatment Plaintiff may wish for or
fancy, see Compl. at 27, the Eighth Amendment does not envision
such a right.  See Hudson v. McMillian, 503 U.S. 1, 9 (1992)
("Society does not expect that prisoners will have unqualified
access to health care"); McNeil v. Redman, 21 F. Supp. 2d 884

29

(C.D. Ill. 1998) (an inmate has no constitutional right to see a doctor on demand).

Moreover, it is long established that medical malpractice is not a cognizable cause of action under the Eighth Amendment, since malpractice is a state law tort. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); Boring v. Kozakiewicz, 833 F.2d 468 (3d Cir. 1987); Bass v. Sullivan, 550 F.2d 229(5th Cir. 1977), cert. denied, 434 US 864 (1977); Rivera v. Small, 1983 U.S. Dist. LEXIS 15869 (S.D.N.Y. June 29, 1983).

For these reasons, all Plaintiff's claims related to the treatment of his health by the medical staff of the F.C.I. Fort Dix should be dismissed.


**B.   Eighth Amendment Rights: Conditions of Confinement**

Plaintiff's allegations with respect to his conditions of confinement unrelated to medical care equally fail to indicate facts constituting cruel and unusual punishment necessary to sustain claim under 42 U.S.C. § 1983.  It appears that these allegations could be subdivided into three groups: (a) harassment of Plaintiff through utterances or facial expressions of prison officials that Plaintiff found offensive; (b) Plaintiff's exposure to excessive air conditioning; and (c) Plaintiff's discussion of Plaintiff's genital herpes with a physician's assistant in the presence of Plaintiff's cellmate.

### 1. Harassments

Plaintiff'S Complaint specifies three occasion that could be construed as Plaintiff's allegation of harassment: (i) the statement made by a physician's assistant "well, you're not dead, so your breathing must be O.K," Compl. at 6, (ii) harassment by laughter by the Associate Warden which followed Plaintiff's discussion of Plaintiff's genital ailment, see id. at 13; (iii) harassment by facial expression of the warden who "did not seem concerned or cared." Id. at 7.

It is well established, however, that acts of verbal harassment, harassment by laughter or by a facial expression cannot qualify as violations of the Eighth Amendment. See Stepney v. Gilliard, 2005 U.S. Dist. LEXIS 31889, at *19 (N.J.D. Dec. 8, 2005) ("[V]erbal harassment and taunting is neither 'sufficiently serious' nor 'an unnecessary and wanton infliction of pain' under the common meaning of those terms. 'Verbal harassment or profanity alone . . . no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under [Section] 1983") (quoting Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp. 2d 241, 244 (D. Me. 2005)); see also Robinson v. Taylor, 2005 U.S. Dist. LEXIS 20951, at *8-9 (D. Del. Sept. 26, 2005) ("[M]ere verbal harassment does

31

not give rise to a constitutional violation[; even if it is] inexcusable and offensive, [it] do[es] not establish liability under section 1983) (quoting <u>McBride v. Deer</u>, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) and citing <u>Moore v. Morris</u>, 116 Fed. App'x 203, 205 (10th Cir. 2004); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 738 (9th Cir. 1997); <u>Collins v. Cundy</u>, 603 F.2d 825, 827 (10th Cir. 1979)); <u>Prisoners' Legal Ass'n v. Roberson</u>, 822 F. Supp. 185, 187-89 (D.N.J. 1993)); <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d 52 (1st Cir. 2002) (plaintiff failed to state a claim upon which relief may be granted when the plaintiff alleged that the defendant official was continually "leering," "scowling," and "pointing" at the plaintiff); <u>Abuhouran v. Acker</u>, 2005 U.S. Dist. LEXIS 12864, at *15 (E.D. Pa. June 29, 2005) ("It is well established . . . that . . . verbal harassment, . . . standing alone, do[es] not state a constitutional claim") (citing <u>Dewalt v. Carter</u>, 224 F.3d 607, 612 (7th Cir. 1999); <u>Williams v. Bramer</u>, 180 F.3d 699, 706 (5th Cir. 1999); <u>Maclean v. Secor</u>, 876 F. Supp. 695, 698 (E.D. Pa. 1995)); <u>Collins v. Cundy</u>, 603 F.2d 825 (10th Cir. 1979) (prisoner's claim that defendant laughed at prisoner and threatened to hang him failed to state a claim cognizable under § 1983). Therefore, Plaintiff's allegations with respect to any statements, laughter or expressions of prison officials that Plaintiff found unpalatable fail to state a claim upon which relief may be granted.

### 2.    Air Conditioned Environment

Plaintiff'S claims with respect to excessive air conditioning[12] are equally unavailing.  Since Plaintiff's Complaint merely indicates Plaintiff's displeasure with powerful air conditioning, but neither indicates that it created an intolerably cold environment, nor that it was administered as a penalty (rather than as a comforting measure to inmates and prison personnel experiencing hot summer), or suggests that the air conditioning caused Plaintiff's health any harm, or hints that Plaintiff was, in one way or another, prevented from using his warm clothing or a blanket in order to make himself comfortable, the air conditioned environment at issue cannot be qualified as a "cruel and unusual punishment."  Of the many conditions in prison that may warrant Eighth Amendment scrutiny, providing too much air conditioning in the summer is not among them.  Hence, Plaintiff's assertions fail to state a claim upon which relief may be granted.  Cf. Davidson v. Murray, 371 F. Supp. 2d 361 (W.D.N.Y. 2005) (where an S.H.U. inmate alleged that, during sub-zero weather, adequate clothing, footwear and

---

[12] Plaintiff describes this condition as follows: "[Plaintiff] was freezing from the [air conditioning]. [Plaintiff concluded that] the Prison [was] slowly giving [Plaintiff] pneumonia. [Plaintiff could not fight the elements [since] it was too cold." See Compl. at 7.  Plaintiff's Complaint does not clarify what "elements" Plaintiff was fighting during the period at issue, that is, June of 2004, while Plaintiff was detained at the Special Housing Unit.  See Pilkey v. Lappin, 05-5417.

blanket were refused to the inmate, while the "yard" doors were
left open, and missing windows were left unrepaired, the inmate's
Eighth Amendment claim was dismissed since there was no
allegation that defendants were either directly responsible for
the lacking prison conditions or knew of an excessive risk to the
inmate's health); Geiger v. Price, 2003 U.S. Dist. LEXIS 12129
(N.D. Tex. July 16, 2003) (dismissing an inmate's claim asserting
that the inmate was stripped and then left naked in the air
conditioned cell for the period of three or four days).

### 3. Lack of Privacy

Plaintiff alleges that, on one occasion, a physician's
assistant visited Plaintiff in Plaintiff's cell and discussed
Plaintiff's genital ailment in presence of Plaintiff's cellmate.
See Compl. at 11.

Although it is well settled that a prisoner does not enjoy
the same right of privacy as do ordinary citizens in their homes
and offices, see United States v. Dawson, 516 F.2d 796, 805 (9th
Cir. 1975); accord Doe v. Delie, 257 F.3d 309 (3d Cir. 2001),
this observation usually relates to inmates' due process rights
rather than those based on the Eighth Amendment.[13]  Plaintiff's

---

[13] Moreover, the right to conceal one's medical history is
mainly derived from the common law of invasion of privacy, rather
than from the constitutional law of privacy.  The strongest
precedent addressing one's constitutional right to conceal his
medical history is Whalen v. Roe, 429 U.S. 589 (1977). The Whalen
Court (1) ruled that the statute requiring maintenance of records
of people for whom physicians prescribed certain drugs did not

allegations, however, appear to be in the nature of Eighth
Amendment since Plaintiff states that the discussion of
Plaintiff's genital ailments in the presence of Plaintiff's
cellmate caused Plaintiff (1) to conclude that his cellmate
"could tell the compound that [Plaintiff] was infected," (2) to
become concerned that such disclosure by cellmate to Fort Dix
inmate population could cause Plaintiff a "detriment,"
unspecified in the Complaint. See Compl. at 11.  This Court
construes these statements as an indication that Plaintiff was
concerned about the possibility that the cellmate's statements to
other inmates might cause Plaintiff either mockery or
discrimination by other inmates or expose Plaintiff to physical
danger.

---

invade any constitutional right of privacy; and (2) implied that
only the disclosure of one's medical records that was made under
the compulsion of government might violate substantive due
process. See id. at 598-600, 605-06, compare Hudson v. Palmer,
468 U.S. 517, 526 (1984) (holding that inmates have no right to
privacy under the Fourth Amendment).  Cases postdating Hudson
concluded that––while prisoners retain a limited right of
privacy––this right is limited to "humiliating searches or
surveillance of prisoners of one sex by guards of the opposite
sex, rather than against the revelation of a prisoner's medical
records"; such searches and surveillance were characterized as
involving the cruel and unusual punishments (rather than invasion
of a prisoner's right of privacy).  See Anderson v. Romero, 72
F.3d 518, 523 (7th Cir. 1995) (conducting a detailed analysis of
the issue and a study of pertinent cases.  The Seventh Circuit
concluded that "a different sense of privacy is invaded when
prison guards maintain visual surveillance of prisoners of the
opposite sex engaged in bathing, urination, or defecation than
when they reveal a person's medical history" and upheld
protection of the former right but not the latter one).

Noting, first and foremost, that the disclosure of
Plaintiff's private matters to Plaintiff's cellmate apparently
occurred with Plaintiff's implied consent, thus barring Plaintiff
from recovery,[14] this Court also finds that the disclosure could

_____

[14] In that respect, the case at bar is vastly different from
either Anderson, 72 F.3d 518, or the case which the Anderson
court grappled with, Woods v. White, 689 F. Supp. 874 (W.D. Wis.
1988).  In Woods, the district court found a violation of the
HIV-infected inmate's right to privacy after medical officers,
without the inmate's knowledge or consent, disclosed the inmate's
HIV status to non-medical prison staff during a social chat.
Five years after affirming Woods without publication, the Seventh
Circuit in Anderson refused to raise its unpublished affirmation
to the level of precedent and concluded that the disclosure of an
inmate's HIV condition without the inmate's knowledge or consent
did not amount to a constitutional violation if the disclosure,
initiated for legitimate penological purposes as a conversation
between housing officers, eventually made it to the inmate's
cellmate and non-medical prison staff.  See Anderson, 72 F.3d at
552-58.
     In the case at bar, Plaintiff states that Plaintiff engaged
in the discussion at issue when the physician's assistant came to
Plaintiff's cell to discuss Plaintiff's numerous medical
problems; the assistant was habitually conducting such in-cell
discussions with Plaintiff prior to the occasion at issue.  See
Compl. 7-11 (discussing various occasions and expressly
acknowledging that four days prior to the occasion at issue, the
physician's assistant "came early[,] and [Plaintiff and the
assistant] talked about [Plaintiff's] medical problems, [after
which the assistant] checked [Plaintiff's] penis, [and] told
[Plaintiff] that [the assistant] did not think [Plaintiff had]
herpes" but rather that he had Balanitis).  Since Plaintiff (1)
had no problem either with the previous in-cell discussions of
his genital ailment, or with previous in-cell examinations of his
penis by the assistant or by other members of the medical staff;
and (2) on the occasion at issue, did not indicate to the
assistant that Plaintiff developed a desire to keep the
discussions private, this Court concludes that Plaintiff
consented to having the discussions in his cell and in the
presence of his cellmate.  See Restatement (Second) of Torts, §
892 ("Consent is willingness in fact for conduct to occur. It may
be manifested by action or inaction and need not be communicated
to the actor.  If words or conduct are reasonably understood by

not qualify as a violation of Plaintiff's Eighth Amendment
rights.  Plaintiff's speculations about potential mockery and/or
discriminatory actions by other inmates, like his speculations
about Plaintiff's potentially diminished safety, fail to state a
claim upon which relief may be granted.

### i.    **Mockery and Discrimination by Inmates**

Neither inmates' mockery of Plaintiff nor other
discriminatory actions by inmates against Plaintiff can qualify
as cognizable claims. See infra this Opinion, pp. 30-31 (for
discussion as to why mockery is not a cognizable claim under the
Eighth Amendment).  Moreover, since neither mockery nor any other
discriminatory activity by other inmates against Plaintiff
actually occurred, such speculative claims are not cognizable.
This Court stresses, once again, that no speculative claims about
an inmate's future conditions of confinement are cognizable under
§ 1983. See, e.g., Rouse v. Pauliilo, 2006 U.S. Dist. LEXIS 17225
(D.N.J. Apr. 5, 2006) (citing  Kirby v. Siegelman, 195 F.3d 1285
(11th Cir. 1999), the case spelling out that a 42 U.S.C. § 1983
claim by a prisoner about his future conditions cannot be deemed

---

another to be intended as consent, they constitute apparent
consent and are as effective as consent in fact").  The assistant
did not violate the scope of consent since Plaintiff's Complaint
does not indicate that the assistant discussed Plaintiff's
genital ailment with any non-medical staff or with members of
general inmate population.  See id., comment c.

ripe for adjudication where the prisoner is yet to discover what those conditions would be and has not suffered any injury).

### ii.  **Speculative Failure to Protect Claim**

Since Plaintiff's claim with respect to his potential future endangerment is equally speculative, the claim is not cognizable under the Eighth Amendment.

Prison officials have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). To state a failure-to-protect claim under 42 U.S.C. § 1983, an inmate must show that he is, as of now, or was in the past, objectively "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant knew of and disregarded that risk. Farmer, 511 U.S. at 837. "The official must both be aware of *facts* from which the inference could be drawn that a *substantial risk of serious harm exists*, and he must also draw the inference." Id. (emphasis supplied). Therefore, in order to prevail on his 42 U.S.C. § 1983 claim asserting that his constitutional rights are/were violated because of the actions of certain officers, Plaintiff must show that an *imminent threat* to Plaintiff's health and/or life. Specifically, Plaintiff must show that: (1) he is *currently* "incarcerated under conditions posing a *substantial risk of serious harm*"; and (2) that the

38

prison officials *expressly intend* to cause Plaintiff harm and/or *knew and disregarded* the risk of harm to Plaintiff.  See  Farmer, 511 U.S. at 837 (emphasis supplied);  Whitley v. Albers, 475 U.S. 312, 319 (1985).

Plaintiff's claim fails the Farmer test.  Nothing in Plaintiff's Complaint indicates that Plaintiff experienced any "incarcerat[ion] under conditions posing a substantial risk of serious harm" to Plaintiff's safety on the grounds of Plaintiff's cellmate being present during Plaintiff's discussion of his genital ailment with the physician's assistant.  Similarly, the Complaint offers no indication that the physician's assistant who, upon Plaintiff's consent, engaged in a medical discussion of Plaintiff's genitalia, either intended to cause Plaintiff harm and/or knew and disregarded a risk of harm to Plaintiff.  In sum, Plaintiff's assertions with regard to "lack of privacy" fail to state a viable claim under the Eighth Amendment.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff's Complaint is dismissed with prejudice for failure to state an Eighth Amendment claim upon which relief may be granted.

An appropriate Order accompanies this Opinion.

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
United States District Judge

Dated:    **June 26, 2006**